E-FILED
Thursday, 29 May, 2008 03:02:02 PM
Clerk, U.S. District Court, ILCD

# United States District Court

FILED
MAY 28 2008
CLERK OF THE COURT
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

CENTRAL DISTRICT OF ILLINOIS

UNITED STATES OF AMERICA

v.

JESSIE JAMES JOINER,
JEREMY L. WALLACE, and
THOMAS A. YARRINGTON

**CRIMINAL COMPLAINT**

CASE NUMBER: 08- 3040-m

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about May 22, 2008 in Sangamon County, in the Central District of Illinois defendant(s) did:

conspire to distribute cocaine in violation of 21 United States Code, Section 846.

I further state that I am a ATF Special Agent (Official Title) and that this complaint is based on the following facts:

See attached affidavit

Continued on the attached sheet and made a part hereof: ■ Yes ☐No

s/ Kevin J. Rollins

Signature of Complainant

Sworn to before me and subscribed in my presence,

May 28, 2008 4:10 pm at Springfield, Illinois
Date City and State

Byron G. Cudmore
U.S. Magistrate Judge
Name & Title of Judicial Officer

s/ Byron G. Cudmore
Signature of Judicial Officer

AFFIDAVIT

I, Kevin J. Rollins, being duly sworn on oath, state as follows:

1. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and am currently assigned to the Springfield, Illinois Field Office. I have been so employed for approximately 19½ years. Prior to my employment with ATF, I was a Deputy Sheriff with the Vermilion County, Illinois Sheriff's Department for three years. During my employment with ATF, I have participated in the preparation and execution of Federal and State search warrants and arrest warrants, and have conducted numerous investigations concerning violations of the Federal narcotics and firearms statutes.

2. This affidavit is in support of a criminal complaint and arrest warrant charging JESSIE JAMES JOINER, (AKA "Tane"), JEREMY L. WALLACE, and THOMAS A. YARRINGTON with Conspiracy to Distribute a Controlled Substance in violation of Title 21, United States Code, Section 846.

3. I am familiar with the following facts based on reliable information officially provided to me by other law enforcement agents.

4. During the early morning hours of March 27, 2008, Illinois State Police Task Force Officer (ISP TFO) Matt McElfresh was in the 3rd Base Inn, 2900 South Lowell, Springfield, Illinois, acting in an undercover capacity. TFO McElfresh subsequently made contact with JOINER and purchased an 1/8 ounce, appr. 3.92 grams (including packaging) of purported cocaine for $150. A field test of the substance purchased from JOINER showed a positive reaction for the presence of cocaine.

5. During the early morning hours of April 3, 2008, TFO McElfresh again entered the 3rd Base Inn, acting in an undercover capacity, and again met with JOINER. This meeting

resulted in the purchase by TFO McElfresh from JOINER of a ¼ ounce, appr. 5.36 grams (including packaging) of purported cocaine for $300. A field test of the substance purchased from JOINER showed a positive reaction for the presence of cocaine. This meeting was electronically recorded with both audio and video.

6. During the early morning hours of April 16, 2008, TFO McElfresh again entered the 3rd Base Inn, acting in an undercover capacity, and again met with JOINER. This meeting resulted in the purchase by TFO McElfresh of a ½ ounce, appr. 14.39 grams (including packaging) of purported cocaine for $500. A field test of the substance purchased from JOINER showed a positive reaction for the presence of cocaine. This meeting was again electronically recorded with both audio and video.

7. On April 30, 2008, at appr. 12:00 pm, TFO McElfresh again met with JOINER at the 3rd Base Inn. This meeting resulted in TFO McElfresh purchasing one (1) ounce, appr. 28.48 grams (including packaging) of purported cocaine for $1000. A field test of the substance purchased from JOINER showed a positive reaction for the presence of cocaine. This meeting was again electronically recorded with both audio and video.

8. On May 7, 2008, at appr. 11:30 am, TFO McElfresh again met with JOINER at the 3rd Base Inn. This meeting resulted in TFO McElfresh purchasing one (1) ounce, appr. 28.48 grams (including packaging) of purported cocaine for $1000. A field test of the substance purchased from JOINER showed a positive reaction for the presence of cocaine. This meeting was again electronically recorded with both audio and video. Also during this meeting, TFO McElfresh made arrangements with JOINER to purchase four (4) ounces of cocaine at a later date.

9. On May 8, 2008, a Federal Search Warrant was issued authorizing the search of JOINER'S residence, 2316 South 5th Street, Springfield, Illinois seeking evidence of the Distribution of Controlled Substances.

10. On May 13, 2008, TFO McElfresh made telephonic contact with JOINER. During this conversation, TFO McElfresh advised JOINER that he did not have the money for four (4) ounces of cocaine, but could purchase two (2) ounces of cocaine. TFO McElfresh and JOINER then made arrangements to meet at the 3rd Base Inn.

11. Appr. 40 minutes later, surveillance units observed JOINER exit his residence and enter his vehicle. JOINER then proceeded in a direction towards the 3rd Base Inn. A traffic stop was then initiated on JOINER by a marked Sangamon County squad car. As the deputy was speaking to JOINER, he requested that JOINER exit his vehicle. As JOINER exited the vehicle, a clear plastic bag containing white powder fell to the ground. The package subsequently weighed 57.41 grams (including packaging), appr. two (2) ounces; and field tested positive for the presence of cocaine.

12. In addition, a second clear plastic bag of white powder was found on the driver's seat of the vehicle. This package subsequently weighed 57.31 grams (including packaging), appr. two (2) ounces; and field tested positive for the presence of cocaine.

13. Also on May 13, 2008, the Federal Search Warrant was executed at JOINER'S residence. Recovered pursuant to the execution of the Search Warrant was over 700 grams of a white powdery substance. The substance was subsequently field tested, and found positive for a substance containing cocaine.

14. Following the execution of the Search Warrant, JOINER was subsequently interviewed at the ATF office. JOINER was advised that he was not under arrest, and could terminate

the interview at any time. At the conclusion of the interview, JOINER was allowed to leave; and stated that he would be in contact with the agents.

15. JOINER identified his source of cocaine as "Jeremy" LNU, appr. 30 years old, of mixed heritage, and works at Friendly Chevrolet in Springfield. JOINER has known "Jeremy" for 14-15 years. JOINER believes that "Jeremy" lives off of West Lawrence near the Fit Club. JOINER subsequently identified an Illinois Secretary of State Driver's License photo of JEREMY L. WALLACE (male/white; DOB: 09/17/76) as the subject he knows as "Jeremy".

16. Appr. eight months ago, JOINER began purchasing cocaine from WALLACE. These purchases started with ½ ounce buys every 4-5 days. These purchases then moved up to 2-4½ ounces every 4-5 days; and lasted for 4-5 months. JOINER would pay WALLACE $1800 for two ounces of cocaine, and $3800 for 4½ of cocaine.

17. For appr. the last 1-1½ months, JOINER has been purchasing 9 ounces of cocaine for $7600 from WALLACE every 1-2 weeks. JOINER stated that he does not add any "cut" to the cocaine, and profits appr. $1400 per ounce of cocaine that he sells.

18. JOINER described WALLACE as a "go-between" for the actual source of cocaine. JOINER has never met the source, but believes he also lives in the area of Lawrence and Rickard Road in a condominium. JOINER stated that when he needs cocaine, he will call WALLACE (217-816-6313) and tell him he needs to "holler at his guy". JOINER will then meet WALLACE at the bowling alley at 2660 West Lawrence and pays WALLACE the money for the cocaine. WALLACE will then depart the area to obtain the cocaine, returning in appr. 20 minutes.

19. JOINER went on to say that through conversations with WALLACE, he remembered WALLACE stating that the source's first name was "Thomas;" and that "Thomas" had recently purchased a Chevrolet Avalanche pick-up from Friendly Chevrolet. WALLACE advised JOINER that although he was a salesman, he did not handle the transaction. This was done in an attempt to distance himself from "Thomas." JOINER also stated that he believed the Avalanche was registered in "Thomas's" girlfriend's name.

20. Surveillance in the area of 734 Rickard Road, Springfield subsequently revealed a maroon Chevrolet Avalanche bearing Illinois Registration 7359T; as well as a gray Buick four door bearing Illinois Registration 872 9191 in the parking lot.

21. An Illinois Secretary of State inquiry of these two vehicles revealed that both vehicles are registered to THOMAS A. YARRINGTON (male/black; DOB: 03/06/82) and MELODY L. PRYOR (female/black; DOB: 09/20/80) at 734 Rickard Road, Apt. 5, Springfield, IL.

22. On May 22, 2008, surveillance was established in the area of 734 Rickard Road, Springfield, Illinois. Surveillance units subsequently observed a white Chevrolet Tahoe, bearing Illinois Registration 28183C, arrive in the area. The vehicle is registered to TIFFANY D. PRYOR-WALLACE (female/black; DOB: 10/29/82). JEREMY WALLACE who was identified as the driver of the vehicle; exited the vehicle and entered 734 Rickard Road, Apt. 5.

23. Appr. 20 minutes later, WALLACE exited the apartment and left the area in the Tahoe. Surveillance units then maintained visual contact with the Tahoe as it traveled south on Veterans Parkway. As the vehicle was attempting to turn east on Prairie

Crossing Drive, towards Friendly Chevrolet, a marked Sangamon County squad car attempted to initiate a traffic stop on the vehicle.

24. The vehicle then traveled at a high rate of speed, and proceeded into the parking lot of Friendly Chevrolet. WALLACE, the lone occupant of the vehicle, then exited the vehicle and ran into the business. Deputies subsequently located WALLACE in the men's restroom of the business.

25. Agents then attempted to interview WALLACE regarding his involvement with THOMAS YARRINGTON and the distribution of cocaine. WALLACE stated that he is only associated with YARRINGTON due to the fact that they are dating sisters. WALLACE refused to answer any other questions, and could not explain why he ran from the officers, or what the white powder was that was located on his clothing.

26. Agents subsequently made contact with THOMAS YARRINGTON following a traffic stop. The agents advised YARRINGTON that WALLACE was being detained by police following his departure from YARRINGTON'S apartment. YARRINGTON initially indicated that narcotics could be found in the apartment, and granted verbal consent for the agents to search the apartment.

27. YARRINGTON subsequently denied agents consent to search the apartment, stating that the apartment was not in his name, but his girlfriend's, MELODY PRYOR; and she was the only one that could grant consent.

28. Agents then made contact with MELODY PRYOR at 734 Rickard Road, Apt. 5. PRYOR subsequently signed a written consent for the agents to search the apartment for evidence of narcotics and narcotics trafficking. PRYOR also denied any knowledge, or ownership of any illegal substances in the apartment.

29. Recovered pursuant to the execution of the consent search was a gallon zip lock baggie containing appr. 322 grams (including packaging) of suspected cocaine, digital scales, five (5) additional one gallon zip lock baggies with suspected cocaine residue, and $14,800 in U.S. Currency. A field test of the appr. 322 grams of suspected cocaine, as well as residue from one of the additional zip lock baggies, resulted in the positive reaction for the presence of cocaine.

30. Following the search of the apartment, YARRINGTON was interviewed at the Sangamon County Jail. Prior to any questioning, YARRINGTON was advised of his Miranda rights, and executed an Advise of Rights and Waiver Form, agreeing to talk to the agents.

31. YARRINGTON stated that he was in fact responsible for the cocaine and currency recovered from the apartment; and that his girlfriend, MELODY PRYOR knew nothing about either one.

32. YARRINGTON stated that he has no steady salary, but makes anywhere from $100-$1700 per month in his music business. Regarding the currency recovered from the apartment, YARRINGTON stated that half of the money was from his music business, and the other half was from the sale of cocaine. YARRINGTON believed that there was between $11,000 and $12,000 in U.S. Currency.

33. YARRINGTON went on to say that although the cocaine was in fact recovered from his possession, it actually belonged to JEREMY WALLACE. YARRINGTON stated that WALLACE would bring the cocaine to his apartment for storage, due the fact that WALLACE had a small child that also lived at his residence.

34. YARRINGTON stated that he believed that WALLACE was in a partnership with a subject he only knows as "Tane" (JESSIE JAMES JOINER). YARRINGTON stated that WALLACE never introduced him to "Tane", but had mentioned his name several times, and stated that he lived on South 5th Street. YARRINGTON stated that WALLACE sells "Tane" cocaine in quantities of 4½ and nine (9) ounces.

35. WALLACE would call YARRINGTON and advise him how much cocaine he needed to pick up. YARRINGTON would then package the cocaine in the quantity specified by WALLACE, which was anywhere from ounce levels, up to 4½ or nine (9) ounces at a time. YARRINGTON also said that he would add Inositol to the cocaine, doubling the amount of cocaine.

36. For storing, cutting and packaging the cocaine, WALLACE would pay YARRINGTON $300 per ounce that was sold. YARRINGTON admitted that due to this, he did in fact "play a part in it" (the distribution of cocaine). YARRINGTON stated that earlier on today's date, he provided three (3) ounces of cocaine to WALLACE, and received $900.

37. YARRINGTON estimated that this arrangement had been going on for approximately four (4) to five (5) months, with the last delivery of cocaine being appr. three (3) weeks ago; and that the cocaine was always in the same type of zip lock bag. YARRINGTON also denied knowing how much cocaine WALLACE brought to the apartment on each occasion because he did not have a scale. YARRINGTON stated that he just recently purchased the scale recovered from the apartment.

38. YARRINGTON also stated that he paid for the Buick that MELODY PRYOR drives. YARRINGTON stated that he paid $2500 cash for the car; and that the money used to purchase the car was derived from money he made in the distribution of cocaine.

FURTHER AFFIANT SAYETH NOT.

s/ Kevin J. Rollins

Kevin J. Rollins, Special Agent
Bureau of Alcohol, Tobacco, Firearms &
Explosives

Subscribed and sworn before me
This 28th day of May, 2008. 4:10 PM

s/ Byron G. Cudmore

BYRON G. CUDMORE
United Stated Magistrate Judge